**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| THE HILB GROUP OF<br>NEW ENGLAND, LLC, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. __3:21cv757____ |
| v. | ) | |
| | ) | |
| SUSAN LEPAGE, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## VERIFIED COMPLAINT

Plaintiff The Hilb Group of New England, LLC ("THG-NE" or "Plaintiff"), by counsel, sets forth the following as its Verified Complaint against Defendant Susan LePage.

## INTRODUCTION

1.      This is an action to stop a skilled and experienced insurance account executive from misappropriating and misusing THG-NE's confidential and trade secret business information to compete unfairly with THG-NE.  As a condition of employment with THG-NE, LePage agreed to maintain the confidentiality of THG-NE's confidential business information, not to use that information to compete with THG-NE, and not to solicit or sell insurance products to certain THG-NE customers for two years after her departure.  Yet, since leaving THG-NE in October, that is exactly what LePage has done.  She has stolen THG-NE's confidential and trade secret information, including a detailed compilation of client and policy information.  And, she has already begun soliciting THG-NE customers' business, in violation of her non-solicitation agreement.  THG-NE thus has no choice but to seek redress from this Court to (1) return its trade

secrets; (2) enjoin LePage from continuing to flout her contractual and other legal obligations; and (3) award damages for the injuries she has caused.

## PARTIES

2.     THG-NE is a Delaware limited liability company and is a subsidiary of The Hilb Group, LLC ("THG").   THG-NE maintains its principal place of business in Cranston, Rhode Island, and THG maintains its principal place of business in Richmond, Virginia.

3.     Upon information and belief, LePage is a Massachusetts resident and domiciliary who resides and may be served with process at 10 Waycross Street, Worcester, MA 01605.

4.     LePage is a skilled insurance account executive, with more than 20 years of experience providing insurance products and services to customers in Massachusetts and other states.

5.     LePage previously worked for Marsh-Kemp Insurance Agency, Inc.   In March 2019, THG-NE purchased the assets of Marsh-Kemp, including its goodwill and client relationships.   After THG-NE's acquisition of Marsh-Kemp, LePage voluntarily became a THG-NE employee.

## JURISDICTION & VENUE

6.     This action is brought in the United States District Court for the Eastern District of Virginia, Richmond Division.

7.     The Court has subject-matter jurisdiction over this action because THG-NE's claims arise under the laws of the United States, including the Defend Trade Secrets Act, 18 U.S.C. § 1831, *et seq*.   In addition, the Court has subject-matter jurisdiction over this action because the parties are residents of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

8.     This Court has supplemental jurisdiction over THG-NE's state law claims under 28 U.S.C. § 1367(a) because such claims are so related to the claims in this action over which the Court has original jurisdiction that they form part of the same case or controversy.

9.     Venue is proper in this Court, and the Court has personal jurisdiction over LePage, because LePage's Confidentiality and Non-Solicitation Agreement (the "Agreement," **Exhibit 1**) states that THG-NE and LePage:

> hereby consent to the exclusive jurisdiction of the courts of the Commonwealth of Virginia located in the City of Richmond and of the United States District Court for the Eastern District of Virginia, Richmond Division (to the extent such courts have subject matter jurisdiction) in connection with any action, suit, or other proceeding in connection with, arising out of, or relating to this Agreement, and agree not to assert in any such action, suit, or proceeding that it, he or she is not personally subject to the jurisdiction of such courts, that the action, suit, or proceeding is brought in an inconvenient forum, or that venue of the action, suit, or proceeding is improper.

Agreement ¶ 15.

## FACTUAL BACKGROUND

### THG-NE's Business and Customer Relationships

10.     THG-NE is, among other things, in the commercial and individual insurance lines brokerage and administration business.  Specifically, THG-NE partners with business owners and individuals to broker and administer a range of customized insurance programs.  Such offerings include, among other things, property and casualty insurance, automobile insurance for business fleets, and workers' compensation insurance for employees.  THG-NE also provides consulting services to assist customers with designing and servicing their commercial and individual insurance needs.

11.     THG-NE provides customized insurance solutions based on its customers' unique insurance needs. For example, THG-NE works with its business customers to assist them in

reducing their workers' compensation, automobile, and other insurance costs while ensuring that they have adequate coverage for situations that may arise in the course of their business. Generally, THG-NE renews policies with its customers on an annual or bi-annual basis.

12.     In part due to its cyclical nature, the insurance brokerage and consulting business is extremely competitive. Accordingly, success in the industry depends in large part on customer relationships and goodwill. Once a customer discontinues its policy or consulting relationship with a particular account executive, the customer is unlikely to return.

13.     Moreover, an agency's insurance brokerage and consulting business often is grown through referrals. As such, the loss of one customer's relationship has a ripple effect of harming the agency's future ability to grow and to compete in the marketplace.

14.     Given the nature of its business, THG-NE has invested significant resources, time, and money into developing its customer relationships and goodwill. THG-NE also invests significant resources, time, and money into developing confidential and trade secret information about its customers. Through its customer relationships, THG-NE has compiled substantial confidential and trade secret information, including its business contacts, customer and prospective customer lists, and information about its customers.

15.     THG-NE's customer relationships, goodwill, and confidential and trade secret information are necessary to maintain THG-NE's successful market position. As such, THG-NE goes to great lengths to protect its interests from misappropriation and unfair competition by former employees.

### THG-NE's Acquisition of Marsh-Kemp

16.     Because of the highly competitive nature of its business, THG and its affiliated entities, including THG-NE, frequently engage in strategic acquisitions to strengthen their position

4

in the marketplace.  THG is primarily an acquisition company, which pays market consideration for its various insurance asset acquisitions.

17.     In March 2019, THG-NE purchased substantially all of Marsh-Kemp's assets through an asset purchase agreement.

18.     Prior to and at the time of THG-NE's Marsh-Kemp acquisition, LePage worked for Marsh-Kemp as an insurance account executive.

19.     LePage's duties for Marsh-Kemp included managing existing customer relationships and ensuring customer satisfaction.  In her client-facing roles, LePage had access to Marsh-Kemp's most sensitive business information, including, but not limited to, client and prospect lists, client reports, business strategies, and marketing strategies.

20.     Immediately following the acquisition, THG-NE began integrating Marsh-Kemp's business.  In connection with the transition, and as condition of her employment with THG-NE, LePage executed the Agreement.

21.     LePage executed the Agreement voluntarily and without any coercion because she wanted to be employed by, and to receive compensation from, THG-NE.  In exchange, THG-NE agreed to employ her and to compensate her handsomely for her services.

22.     THG-NE complied with all of its obligations under the Agreement.

23.     As an account executive for THG-NE, LePage continued performing client-facing responsibilities, including soliciting and brokering sales of insurance and other products to "upsell" to new and existing customers, selling and providing consulting services to existing clients, managing existing customer relationships, and other services to ensure customer satisfaction.  She also continued to have access to Marsh-Kemp's—and now THG-NE's—most sensitive business

information, including, but not limited to, client and prospect lists, client reports, business strategies, and marketing strategies.

### THG-NE's Efforts to Protect Its Customer Relationships, Goodwill, and Confidential Information

24.     The insurance brokerage industry is highly competitive.  Success in the industry depends on, among other things, identifying, developing, and maintaining relationships with customers.  As such, customer relationships and goodwill are of the utmost importance in THG-NE's industry.  THG-NE therefore invests substantial resources into its account executives and other business producers to establish goodwill and strong relationships with customers.  This makes THG-NE vulnerable to business producers who can leverage those relationships to compete with THG-NE after leaving THG-NE's employ.

25.     Additionally, THG-NE's success in the industry depends on its ability to develop and protect its confidential and trade secret information.  THG-NE has acquired, created, and compiled valuable confidential and trade secret information through the customer relationships it has developed and maintained and the services it has provided.

26.     THG-NE's confidential and trade secret information includes, but is not limited to, customer contact lists, client detail reports containing detailed information about the key-decision makers, revenues, and commissions, customer leads and prospects, customer history and analyses, marketing plans, and similar information about THG-NE's business and its customers' insurance policies and needs.

27.     THG-NE has expended and continues to expend considerable resources acquiring and developing this confidential and trade secret information and the relationships its employees cultivate with customers using this information.  This information and these relationships were developed for the benefit of THG-NE, not the employees individually.

28.     Because THG-NE's information and business relationships are so sensitive and valuable, THG-NE has a legitimate interest in protecting its confidential information, relationships with customers and prospective customers, and customer goodwill against unfair competition by former employees.  THG-NE undertakes significant measures to protect itself from such unfair competition.

29.     THG-NE ensures the confidentiality and secrecy of its confidential and trade secret information by, for example, maintaining that information on password-protected computer systems and limiting access to the information on a "need to know" basis.  THG-NE also protects its legitimate business interests by requiring employees to enter into agreements containing confidentiality and other restrictive covenant obligations.

30.     To protect the sensitive business information, client accounts and relationships, and goodwill it acquired from Marsh-Kemp, THG-NE took these protective measures with LePage.

31.     In the Agreement, LePage acknowledged that she would "have significant responsibilities that involve access to and review" of THG-NE's confidential information, including customer pricing, rates, and lists.  Agreement, ¶ 4(A).

32.     LePage agreed that she would "not (except as expressly authorized in writing by the Company, or unless compelled to disclose the Confidential Information by judicial or governmental authority) disclose any Confidential Information to any person or entity other than the Company or another one of the Hilb Companies, unless and until such Confidential Information has become public knowledge without fault by Employee." *Id.* ¶ 4(C).

33.     LePage also agreed that, "[u]pon the cessation of [her] employment with the Company, or upon the Company's request, [she] shall deliver to the Company any and all

Company property," including any "material containing or disclosing Confidential Information." *Id.* ¶ 4(G).

34.    LePage further agreed:

[E]xcept in the regular course of employment by the Company or as the Company may expressly authorize or direct in writing, during Employee's employment with the Company and for a period of two (2) years immediately following the termination of Employee's employment for any reason, Employee shall not directly or indirectly:

A.    have contact with, solicit, or assist in the solicitation of any of the Company's Customers (as defined below) for the purpose of selling or providing any Competitive Products or Services (as defined below);

B.    provide Competitive Products or Services to any Customer for or on behalf of any person or entity other than the Company; or

C.    induce or attempt to induce any of the Company's Customers to cease doing business in whole or in part with the Company.

Agreement ¶ 5.

35.    The Agreement defined "Competitive Products or Services" as "any services or products competitive with any product or service sold, offered for sale, or under development by the Company as of the date of Employee's termination of employment." *Id.*

36.    The Agreement defined "Customer" to mean "as of the date of termination of Employee's employment, any individual or entity that is a customer of the Company with whom Employee (i) had contact or communications within the immediately preceding twenty-four (24) month period as a result of employment with the Company (ii) for whom Employee had supervisory, sales or service responsibility within the immediately preceding twenty-four (24) month period as a result of employment with the Company; or (iii) about whom Employee possessed Confidential Information or Third Party Information (including, but not limited to, risk management characteristics) as a result of employment with the Company." *Id.*

37.     LePage also agreed that, during her employment "with the Company and for a period of two (2) years immediately" thereafter, she would not:

> directly or indirectly contact, solicit or assist in the solicitation of any 'Then-Present Employee' for the purpose of employing him or her or obtaining his or her services to provide or assist in providing Competitive Products or Services for or on behalf of any person or entity other than the Company or otherwise causing him or her to leave employment or engagement with the Company.

*Id.* ¶ 6.

38.     The Agreement defined "Then-Present Employee" as "any individual who is an employee or officer of the company at the time of contact or solicitation (1) with whom Employee had contact as a result of employment with the Company; or (2) whose identity Employee learned as a result of employment with the Company." *Id.* ¶ 6.

39.     LePage "acknowledge[d] that the restrictions stated herein [in the Agreement] are reasonable and necessary to protect the legitimate business interests of the Company and do not unduly impede or interfere with the Employee's ability to earn a livelihood." *Id.* ¶ 9.

40.     Finally, LePage acknowledged that "actual or threatened breach" of the Agreement "shall result in irreparable harm, for which the Company will not have an adequate remedy at law," and that THG-NE would, in the event of such an actual or threatened breach, be entitled to "equitable relief in the form of specific performance, temporary restraining order, temporary or permanent injunction, an accounting of any profits obtained by Employee on account of such breach, or any other equitable remedy which may then be available." *Id.* ¶ 12. "If any judicial or other proceeding is brought to enforce or interpret the terms of this Agreement, the Company, if it prevails in such proceeding, shall be entitled to recover its costs, expenses and fees (including reasonable attorneys' fees) incurred by the Company in such proceeding." *Id.*

41.     At all times, LePage was aware of her restrictive covenant obligations under the Agreement.

42.     Restrictive covenants, such as those contained in the Agreement, are common in the highly competitive employee insurance brokerage and consulting industry.

**LePage Steals Confidential Business Information in
Preparation to Compete with THG-NE and Solicits THG-NE's Customers**

43.     On October 29, 2021, LePage resigned from THG-NE.

44.     On October 20, just nine days before her resignation, LePage received at her personal e-mail account a spreadsheet entitled "Sues Book of Biz 10-6-21.xlsx," a client contact list of nearly 100 THG-NE customers or prospective customers. The total term premium revenue for the accounts in this Book of Biz spreadsheet exceeds four million dollars ($4,000,000.00), and relates to clients in multiple states.

45.     The spreadsheet that LePage received at her personal e-mail also contained information about each customer's insurance purchases, including the total revenue, total amount billed to each customer, the number of policies owned by each customer, and their premium amounts.

46.     This information is highly sensitive and would be invaluable to a competitor of THG-NE, which could readily use this information to approach THG-NE's customers and to attempt to better THG-NE's prices.

47.     LePage had no legitimate business reason for having a client contact list in her personal e-mail account. She also could not have compiled this client contact list from memory or through legitimate means. That is why she decided to steal it.

48.     The information in the "Sues Book of Biz" spreadsheet is highly valuable, available only to select THG-NE employees, and is not known to THG-NE's competitors. Marsh-Kemp

and THG-NE expended significant efforts in developing this information through their client relationships.

49.     Immediately after leaving THG-NE, LePage began selling competing insurance products.

50.     On November 19, 2021, THG-NE sent a letter to LePage to demand her compliance with her legal obligations to THG-NE.  (**Exhibit 2**.)

51.     The letter specifically reminded LePage that she had agreed "to maintain the confidentiality of THG-[NE]'s confidential information and not to use or disclose such confidential information without THG-[NE]'s permission." *Id.*

52.     The letter also demanded that LePage "return any and all Company documents, records, information, software, or other Company property *immediately*." *Id.* (emphasis in original).

53.     Three days later, on November 22, a customer left a voicemail on LePage's THG-NE phone line, stating that he was "calling [her] back" about making an appointment with LePage to "get[] paperwork together."  The voicemail was clearly intended for LePage's personal phone number, and, based on its contents, was in response to contact from LePage.

54.     Two days later, on November 24, THG-NE received another voicemail on LePage's THG-NE phone line from a customer who was returning a call from LePage.  LePage was prohibited from soliciting both of these customers under the terms of the Agreement.

55.     LePage did not respond to the substantive demands in THG-NE's letter.  Despite her categorical denial of wrongdoing, LePage kept and continued to possess the THG-NE documents she stole leading up to her resignation.

56.     LePage's theft of THG-NE's confidential business documents is a serious and legitimate concern for THG-NE, as is her attempt to steal THG-NE customers, despite her promise not to do so.

57.     LePage's refusal to abide by her contractual obligations has caused THG-NE significant and irreparable harm.

58.     When an experienced account executive, like LePage, successfully takes a customer with her, the resulting losses are difficult to measure. This is due in part to the loss of that customer's future referrals and because the specific value of any given customer in the insurance field is subject to a multitude of variable factors, including the type of policy and commission rates.

59.     Given this difficulty in valuing losses, there is tremendous value to protecting THG-NE's confidential and trade secret information and customer base from further unlawful competition by LePage, as the resulting damage cannot be undone.

60.     If LePage is not prevented from using THG-NE's confidential and trade secret information to compete with THG-NE and soliciting its customers, THG-NE risks losing the customers previously serviced by LePage and possibly other customers. The resulting harm will not be reversible or easy to quantify.

## COUNT I
### (Breach of Contract)

61.     THG-NE incorporates by reference Paragraphs 1 through 60.

62.     The Agreement attached hereto as Exhibit 1 is a valid and enforceable contract between THG-NE and LePage.

63.     LePage and THG-NE exchanged adequate and sufficient consideration in connection with the Agreement.

12

64.     THG-NE performed all its obligations under the Agreement.

65.     The confidentiality requirements contained in the Agreement, including those set forth in Paragraphs 32 and 33 above, are valid and enforceable.

66.     The non-solicitation requirements contained in the Agreement, including those set forth in Paragraph 34 above, above are valid and enforceable.

67.     The restraints imposed by the Agreement's confidentiality and non-solicitation requirements are no greater than necessary to protect THG-NE's legitimate business interests.

68.     The restrictions contained in the Agreement are not unreasonably harsh or oppressive in curtailing LePage's legitimate efforts to earn a livelihood.

69.     The restraints imposed by such restrictions are reasonable from the standpoint of public policy and are consistent with industry standards.

70.     LePage's conduct described herein, including, but not necessarily limited to, stealing THG-NE's confidential information and soliciting and selling competitive products to prohibited customers, constitutes a breach of her obligations under the Agreement.

71.     As a consequence of LePage's conduct, THG-NE has suffered and/or will continue to suffer irreparable harm or loss, and has suffered and will continue to suffer financial and economic loss.

## <u>COUNT II</u>
### (Misappropriation of Trade Secrets Under the Defend Trade Secrets Act)

72.     THG-NE incorporates by reference Paragraphs 1 through 71.

73.     THG-NE's confidential and trade secret information provides THG-NE a competitive business advantage over others in its industry who do not know or use such information.

74.     This information has independent economic value because it is not generally known to, and is not readily ascertainable by proper means by persons other than THG-NE who could obtain economic value from its disclosure or use.

75.     THG-NE has taken steps to maintain the secrecy of its confidential and trade secret information by maintaining the information on a password protected computer system, limiting access to such information to personnel who require same for THG-NE business, requiring employees, including LePage, to maintain the secrecy and confidentiality of the information as a term and condition of their employment with THG-NE, and reminding former employees, including LePage, of their requirement to comply with the restrictive covenants in their agreements with THG-NE and to return THG-NE's confidential and trade secret information and other property.

76.     LePage has misappropriated THG-NE's confidential and trade secret information, including the "Book of Biz" spreadsheet, and has used, is using or intends to use that information to compete directly with THG-NE in violation of her contractual and other obligations, including the duty of loyalty, to THG-NE.

77.     The information LePage misappropriated was developed and maintained for exclusive use by THG-NE and its employees and not for competition against THG-NE.

78.     The information LePage misappropriated is highly valuable and is not known to THG-NE's competitors. The information allows LePage (and others working in concert with her) to start targeting her former customers immediately with knowledge of the customers' premiums and the revenue. The information constitutes a trade secret used in interstate commerce under applicable law.

79.     LePage's unlawful misappropriation of THG-NE's confidential and trade secret information has caused and will continue to cause THG-NE damage.

80.     LePage's actions in misappropriating THG-NE's confidential and trade secret information for her own gain were willful, wanton, and malicious, and were taken in bad faith and with reckless disregard for THG-NE's rights.

81.     LePage's actions have caused and will continue to cause damages in an amount to be determined at trial, but also have caused and will continue to cause THG-NE irreparable harm if not preliminarily and permanently enjoined.  The irreparable harm to THG-NE consists of ongoing damage to its competitive position in the marketplace, damage to its business reputation, loss of the exclusive use of its carefully developed trade secrets, none of which can be compensated by money damages.

82.     THG-NE has no adequate remedy at law because LePage's actions are ongoing and are affecting its goodwill, reputation and ability to compete in a highly competitive marketplace.

## COUNT III
### (Breach of Fiduciary Duty)

83.     THG-NE incorporates by reference Paragraphs 1 through 82.

84.     Because she was entrusted with THG-NE's confidential and trade secret information and customer relationships, LePage occupied a position of trust and confidence at THG-NE, and had a fiduciary duty that required her to act in the best interests of THG-NE.

85.     By stealing THG-NE's confidential and trade secret information with the intent to use that information to THG-NE's detriment, LePage breached her fiduciary duty to THG-NE.

86.     LePage's actions have caused and will continue to cause damages in an amount to be determined at trial, but also have caused and will continue to cause THG-NE irreparable harm if not preliminarily and permanently enjoined.  The irreparable harm to THG-NE consists of

ongoing damage to its competitive position in the marketplace, damage to its business reputation, loss of the exclusive use of its carefully developed trade secrets, none of which can be compensated by money damages.

87.    By breaching her fiduciary duty to THG-NE, LePage acted with malice, wantonness, bad faith, and with the specific intent to cause harm to THG-NE.  Accordingly, to punish LePage and to deter her from engaging in such misconduct, THG-NE is entitled to punitive damage in an amount to be determined at trial.

## COUNT IV
### (Conversion)

88.    THG-NE incorporates by reference Paragraphs 1 through 87.

89.    LePage is in wrongful possession of THG-NE's documents and electronically stored information, which contain confidential and trade secret information.  These materials are THG-NE property.

90.    LePage has wrongfully asserted dominion or control over THG-NE's property in a manner inconsistent with THG-NE's exclusive ownership and entitlement to such property.

91.    As a direct and proximate result of LePage's conversion of its property, THG-NE has suffered and will continue to suffer damages and irreparable harm.

92.    THG-NE has no adequate remedy at law because LePage's actions are affecting its goodwill, reputation and ability to compete in a highly competitive marketplace.

93.    By converting THG-NE's property for her own benefit, LePage acted with malice, wantonness, bad faith, and with the specific intent to cause harm to THG-NE.  Accordingly, to punish LePage and to deter her from engaging in such misconduct, THG-NE is entitled to punitive damage in an amount to be determined at trial.

**REQUEST FOR INJUNCTIVE RELIEF**

94.     THG-NE incorporates by reference Paragraphs 1 through 93.

95.     By virtue of the allegations in this Verified Complaint, THG-NE has demonstrated a likelihood of success on the merits and that a balancing of the equities favors the issuance of an injunction against LePage.

96.     Unless LePage is preliminarily enjoined from engaging in any additional misconduct, THG-NE will be irreparably harmed in the marketplace by the loss of its confidential information and trade secrets and customers and customer goodwill and by damage to its reputation in the insurance marketplace.

97.     Such conduct would result in substantial loss which is unascertainable at this point in time, and future economic loss which is presently incalculable.

98.     THG-NE has no adequate remedy at law for LePage's misconduct, and LePage has contractually agreed in her Agreement that THG-NE shall be entitled to injunctive relief to enforce the restrictions in the agreement, with such relief specifically including a temporary and/or permanent injunction, along with such other equitable relief as may be appropriate under the circumstances.

**PRAYER FOR RELIEF**

WHEREFORE, THG-NE respectfully requests the following:

A.     Injunctive relief against LePage, whether acting alone or in concert with others, requiring her to comply with her obligations under the Agreement;

B.     An order requiring LePage to identify, isolate or quarantine, and refrain from using all THG-NE electronically stored information, including all confidential and trade secret information, in LePage's possession, custody, or control within twenty-four (24) hours;

C.      An order requiring LePage to deliver all THG-NE hard copy documents, including all confidential and trade secret information in hard copy format, in LePage's possession, custody, or control, to the undersigned counsel within twenty-four (24) hours;

D.      An order requiring LePage to provide the undersigned counsel, within twenty-four (24) hours, a signed representation under oath that LePage has complied with Paragraphs B. and C. above.;

E.      An order requiring LePage to provide a list of all computers and other electronic storage devices in her possession, custody, or control that she has used since September 1, 2021;

F.      An order requiring LePage to produce her personal computers and any other electronic storage devices in her possession, custody, or control that contain or at any time have contained THG-NE's confidential and trade secret information to the undersigned counsel;

G.      An order granting THG-NE the right to conduct, through reputable experts in the information technology field, an immediate inspection of LePage's personal computers and any other electronic storage devices produced by LePage that contain THG-NE's confidential and trade secret information;

H.      An order requiring LePage to identify all THG-NE clients with whom she has had contact since September 1, 2021;

I.      An order requiring LePage to identify all persons to whom she has disclosed THG-NE's confidential and trade secret information;

J.      An order requiring LePage, and anyone acting in concert with her, to preserve and not destroy or alter in any manner all documents or other information in her possession, custody or control (including, but not limited to, notes, calendar entries, invoices, e-mails, text messages, voice messages, and phone records) that may be relevant or discoverable in this litigation,

including, but not limited to, all records and any other evidence of LePage's misappropriation of THG-NE's records or property or communications with any of the accounts which LePage is prohibited from soliciting under the Agreement;

       K.     An accounting of all income earned or derived from any business activity with any prohibited client contact or from any business activity which violates LePage's contractual obligations to THG-NE.

       L.     An order permitting THG-NE to take expedited discovery to determine the scope and nature of LePage's unlawful conduct.

       M.     Actual damages against LePage in excess of $75,000.00, in an amount to be determined at trial;

       N.     Punitive damages in an amount to be determined at trial;

       O.     Attorneys' fees and costs;

       F.     Interest;

       G.     For a trial by jury on all issues so triable; and

       H.     Any other relief the Court deems appropriate.

This 7th day of December, 2021.

                   Respectfully submitted,

                   **THE HILB GROUP OF NEW ENGLAND, LLC**

                   By:    */s/Rodney A. Satterwhite*

                   Rodney A. Satterwhite (VSB No. 32907)
                   Heidi E. Siegmund (VSB No. 89569)
                   MCGUIREWOODS LLP
                   Gateway Plaza
                   800 East Canal Street

Richmond, VA 23219-3916
(804) 775-1000
rsatterwhite@mcguirewoods.com
hsiegmund@mcguirewoods.com

*Counsel for Plaintiff*

## <u>VERIFICATION</u>

I, Jason, Angus, am a duly authorized representative of The Hilb Group of New England, LLC ("Plaintiff"). I hereby state that I have read the foregoing Verified Complaint and that the statements set forth therein are true as I believe based on my personal knowledge and information supplied to me by Plaintiff's employees and agents and through records kept by Plaintiff in the ordinary course of business.

This 6th day of December, 2021.

Jason Angus
Chief Operating Officer